## In re HARRIS.

### (District Court, D. Massachusetts. March 19, 1924.)

### No. 31475.

**Bankruptcy ⊗═══91 (2)—Allegation of act of bankruptcy held not sustained.**

An allegation in an involuntary petition that the alleged bankrupt committed an act of bankruptcy by transferring, when insolvent, a portion of his property to a creditor with intent to prefer such creditor, *held* not sustained by the evidence.

In Bankruptcy. In the matter of Eugene B. Harris, alleged bankrupt. Hearing on involuntary petition and answer by objecting creditors. Petition dismissed.

Maurice Palais, of Boston, Mass., for petitioning creditors.

Frederic G. Bauer and Fowler, Bauer & Kenney, all of Boston, Mass., for creditor opposing adjudication.

BREWSTER, District Judge. An involuntary petition in bankruptcy is opposed by creditors, one of whom holds an attachment which will be dissolved if adjudication is ordered. The bankrupt did not appear.

The petition was referred to a master to report on the question of adjudication and is now before the court on the master's report.

The only act of bankruptcy relied upon is the act set forth in section 3a, clause 2 (Comp. St. § 9587), namely, that the debtor "transferred, while insolvent, any portion of his property to one or more of his creditors with intent to prefer such creditors over his other creditors."

It is contended by the objecting creditors:

(a) That it does not appear from the master's report and the inventory and appraisal filed in the case that the debtor was insolvent;

(b) That it does not appear from the master's report that the debtor transferred any portion of his property to his creditor; and

(c) That on the master's report it must be held that the bankrupt did not intend to prefer such creditor over his other creditors.

The pertinent facts are as follows:

Harris was engaged in the business of buying and selling surplus army goods and general merchandise of like character, and, in connection with the business, maintained a warehouse and conducted two stores in Boston. Harris was away from Boston a good deal, and was represented in the conduct of his business in that city by his son, Eugene B. Harris, Jr., a bookkeeper, Albert E. Tyler, and he had also given a power of attorney to the cashier of the Boylston National Bank, the principal objecting creditor. This power of attorney was limited to the signing and indorsing of checks, drafts, and notes up to a stated amount per month. Except for the purposes of paying Tyler's salary check, the power was not exercised during the four months preceding the filing of the petition in bankruptcy.

⊗═══For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

On or about November 21, 1922, Harris, to escape contemplated criminal proceedings, left for parts unknown. He left no instructions with Tyler, other than to keep on with certain claims which Harris had against the United States government.

On November 20, 1922, the alleged bankrupt owed the Boylston National Bank approximately $57,000, a portion of which indebtedness was secured by assignments of accounts and by other collateral.

Previous to his disappearance, the bank had demanded of Harris that he materially reduce his obligations to it, and on November 22, 1922, and again on December 2, 1922, the bank attached by mesne process his stores, and by trustee process certain deposits in other banks, and on the same day appropriated and applied to his indebtedness $4,867.96, representing the balance then standing to the credit of Harris in the bank.

After the attachment, by virtue of which keepers had been placed in charge of the stores, Tyler continued in charge of the main office and continued to carry on his work along the same lines, and within the same scope of authority, which had obtained prior to Harris' disappearance. He continued to collect accounts, including those assigned as collateral.

It appears to have been the custom of Tyler before the attachment to deposit these collections in the First National Bank, and to later transfer funds in that bank to the Boylston National Bank. After December 2, 1922, Tyler deposited the proceeds of collections directly in the Boylston National Bank, and thereafter, to wit, on January 13, 1923, the bank appropriated $324.39, and on February 7, 1923, $5,269.12, and on February 13, 1923, $900.10, making a total amount deposited by Tyler and appropriated by the bank subsequent to December 2, 1922, of $6,493.61. In this amount was $5,325, which Tyler had collected and deposited, representing the proceeds of an account which had been, prior to the four-months period, assigned to the bank as collateral, leaving a balance of $1,168.61, representing the proceeds of accounts receivable and not held as collateral by the bank.

From the evidence before the master, he finds that the total assets of the bankrupt on November 22, 1922, were a little over $88,000, and the total liabilities a little over $99,000.

In the statement of assets he does not include a claim against the United States, which appraisers have since valued at $50,000. Either the master had no evidence before him relative to the claim against the government, or he found it of no value. In either event, he was warranted in finding, as he did from the evidence before him, that the bankrupt was insolvent. In view of my conclusions respecting other aspects of the case, it becomes unnecessary to disturb the finding of the master on the question of insolvency.

The real question upon which this case turns is whether the deposits appropriated by the bank constituted a transfer made by the alleged bankrupt with intent to prefer it over other creditors.

As to the $4,867.96 appropriated by the bank on December 2, 1922, it does not appear that Tyler, or any other agent of Harris who may have made the deposits, had any reason to suppose that the bank was

about to bring' suit or appropriate the funds. It is clear, therefore, that respecting this sum the evidence falls short of establishing an act of bankruptcy.

As to the $5,325, which represented the proceeds of an account assigned to the bank prior to the four-months period, these proceeds belonged to the bank by virtue of the assignment, and the deposit of that amount in the Boylston National Bank could not be said to constitute an act of bankruptcy.

It remains to be considered whether the $1,168.61, representing the proceeds of unassigned accounts which had been deposited from time to time between December 2, 1922, and February 13, 1923, were deposited with an intent on the part of the bankrupt or his agents to transfer the same to the Boylston National Bank, in order to prefer it over the other creditors of Harris. The referee finds that there was no collusion between the bank and Tyler in making these deposits, that Tyler's motive in changing the deposits to the Boylston National Bank was because he thought the bank would attach them if deposited elsewhere, and that this depositary was more convenient to the location of his office, and after very careful consideration of all the facts established by the evidence, and such inferences of fact as could properly be deduced therefrom, the referee reaches the conclusion that the petitioners have not sustained their burden of proving that the transactions amounted to a transfer with intent to prefer the Boylston National Bank over other creditors. With this conclusion I agree, and on the referee's report, therefore, it appears that the bankrupt, although insolvent, did not commit the act of bankruptcy alleged therein.

The referee's report is confirmed, and the petition dismissed.